UNITED STATES v. ASSIA.

(Circuit Court, E. D. New York. October 30, 1902.)

1. CUBA—MILITARY OCCUPATION—SOVEREIGNTY—CRIMES—JURISDICTION.

The joint resolution by congress of April 20, 1898 [U. S. Comp. St. 1901, p. 2790], after declaring that "the people of the island of Cuba are, and of right ought to be, free and independent," further states "that the United States hereby disclaims any disposition or intention to exercise sovereignty, jurisdiction, or control over said island, except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the island to its people." After the Treaty of Paris, a military governor of the island was appointed by the secretary of war, and the military governor after-

wards provided for a civil government, with the various departments and courts. The act of June 6, 1900, amending Rev. St. § 5270 [U. S. Comp. St. 1901, p. 3591], provides for honoring requisitions from the chief executive officer in "control" of a "foreign country or territory" under the "control" of the United States. *Held,* that Cuba, under the military governor, was a foreign country, so that one committing a crime on a vessel registered at a Cuban port was not subject to trial therefor in the courts of the United States.

### Indictment for Manslaughter.

The defendant was delivered to the United States consul at Haytí, who sent him to the United States court in Brooklyn for trial. At the close of the trial the defendant's counsel moved to dismiss the indictment on the ground that the court had no jurisdiction of the offense disclosed by the evidence, which was committed on a vessel sailing under a registry issued by the military government established by the United States in Cuba. The motion was opposed on the ground that the registry issued by the military government in Cuba did not make the vessel a foreign vessel, but that such registry was really an American registry; that, although Cuba was foreign territory when reference is made to the territory of the United States as it existed previous to the war with Spain, still it was not a foreign country while in possession of the United States; and that, when Spain relinquished Cuba, the sovereignty passed to the United States, and remained in them until it passed to the existing government of Cuba pursuant to the act of congress known as the "Platt Amendment," which fixed the terms and conditions on which the island should be released by the United States. And this distinction is indicated in section 5270 of the United States Revised Statutes, as amended by the act of June 6, 1900 [U. S. Comp. St. 1901, p. 3591].

George H. Pettit, U. S. Atty.

Joseph T. Ryan, for defendant.

THOMAS, District Judge. The force of the language in the Neely Case (21 Sup. Ct. 302, 45 L. Ed. 448) to which attention has been called by the learned district attorney, is recognized, but the general analysis of that case enforces the conclusion reached in this matter. The defendant is charged with manslaughter. The evidence shows that the alleged offense was committed on the steamship Paloma while at a port of Hayti. The ship registered at Havana, was operated by persons residing at the port of New York, and had for many years run between such port, Havana, and other ports in the West Indies. At the time of the alleged offense the Paloma carried at her stern the American flag, under which, and upon the same staff, was the flag of Cuba. It does not appear at what precise date the registration was had at Havana, but it was during the year next preceding the alleged offense, and succeeded to a former and long-continued registration at the port of New York. The master of the vessel was a citizen of the United States, the defendant is a citizen of Spain, and the deceased was, presumably, a subject of Russia. The question is whether the vessel upon which the alleged crime was committed was an extension of the territory of the United States or of a foreign nation, to wit, Cuba.

The joint resolution passed by congress April 20, 1898 [U. S. Comp. St. 1901, p. 2790], after declaring that "the people of the island of Cuba are, and of right ought to be, free and independent," and that the government of the United States should demand that

the government of Spain relinquish its authority and government in the island, and that the president be directed and empowered to carry the resolution into effect, further states: ·

"That the United States hereby disclaims any disposition or intention to exercise sovereignty, jurisdiction or control over said island, except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the island to its people."

The successful issue of the war was followed by the Treaty of Paris in December, 1898. On December 13, 1898, thereafter, an order was issued by the secretary of war, pursuant to the direction of the president, stating that a division to be known as the "Division of Cuba," consisting of the geographical departments and provinces of the island of Cuba, with headquarters at Havana, was created and placed under the command of Maj. Gen. Brooke, who was required, in addition to his command of the troops in the division, to "exercise the authority of military governor of the island." On the 1st of January, 1899, the sovereignty of Spain was formally relinquished, and Gen. Brooke entered upon the exercise of his duties as military governor. On January 11, 1899, "the military governor, 'in pursuance of the authority vested in him by the president of the United States, and in order to secure a better organization of the civil service in the Island of Cuba,' ordered that thereafter 'the civil government shall be administered by four departments, each under the charge of its appropriate secretary,' to be known, respectively, as the departments of state and government, of finance, of justice and public instruction, and of agriculture, commerce, industries, and public works, each under the charge of a secretary. To these secretaries 'were transferred, by the officers in charge of them, the various bureaus of the Spanish civil government.' Subsequently, by order of the military governor, a supreme court for the island was created, with jurisdiction throughout Cuban territory, composed of a president or chief justice, six associate justices, one fiscal, two assistant fiscals, one secretary or chief clerk, two deputy clerks, and other subordinate employés, with administrative functions, as well as those of a court of justice in civil and criminal matters. By order of a later date, issued by the military governor, the jurisdiction of the ordinary courts of criminal jurisdiction was defined." On the 13th of June, 1900, Gen. Wood, the then military governor of Cuba, made his requisition upon the president for the extradition of Neely under the act of congress passed June 6, 1900. Neely had been in charge of the collections and deposits of money of the department of posts of the city of Havana, and was charged with having embezzled funds that came into his custody as such official. The act of June 6, 1900, was an amendment of section 5270 of the Revised Statutes [U. S. Comp. St. 1901, p. 3591], which relates to the surrender of persons upon requisitions "of any foreign government," and such amendment, among other things, provides "that whenever any foreign country or territory, or any part thereof, is occupied by or under the control of the United States, any person who shall violate, or who has violated, the criminal laws in force therein, by the commission of any of the following offenses [naming them]," where

such crimes were "committed on the high seas, on board a ship owned by or in control of citizens or residents of such foreign country or territory, and not under the flag of the United States, or some other government," and "who shall depart or flee * * * to the United States or to any territory thereof * * *" on "the written request or requisition of the military governor or other chief executive officer in control of such foreign country or territory shall be returned and surrendered as hereinafter provided to such authorities for trial under the laws in force in the place where such offense was. committed." The supreme court, in its consideration of the case, stated:

"So that the applicability of the above act to the present case—and this is the first question to be examined—depends upon the inquiry whether, within its meaning, Cuba is to be deemed a foreign country or territory."

The learned justice writing the opinion, after stating the facts already mentioned, continues:

"The facts above detailed make it clear that within the meaning of the act of June 6, 1900, Cuba is foreign territory. It cannot be regarded in any constitutional, legal, or international sense a part of the territory of the United States. * * * Cuba is none the less foreign territory, within the meaning of the act of congress, because it is under a military governor appointed by and representing the president in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without interference by other nations."

It was urged in behalf of the defendant in the Neely Case that he was entitled to the benefit of the provisions of the federal constitution relating to the writ of habeas corpus, bills of attainder, ex post facto laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument. Respecting this Mr. Justice Harlan says, "The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." This illustrates that Cuba was not subject to the federal constitution. It was adjudged (Neely v. Henkel, 180 U. S. 109, 21 Sup. Ct. 302, 45 L. Ed. 448) that, although the defendant was a citizen of the United States, he had committed a crime in a foreign country, and that he was amenable to the laws of such country.

Thus it appears that the Paloma, the ship upon which the offense in the action at bar was committed, was registered at a port of Cuba, which at the time was a foreign country, and removed from the jurisdiction of the constitution of the United States, and that the defendant was amenable to the laws of Cuba, and the federal courts therefore have no jurisdiction of this offense.